IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Linda F. Thivener, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>Michael J. Astrue, )<br>Commissioner of Social Security, )<br>)<br>Defendant. )<br>_____ ) | Civil Action No. 6:08-1840-WMC<br><br>**O R D E R** |

   This case is before the court for a final order pursuant to Local Rule 73 and Title 28, United States Code, Section 636(c).  The case was referred to this court for disposition by order of the Honorable R. Bryan Harwell, United States District Judge, filed May 15, 2008.

   The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

   The plaintiff protectively filed applications for disability insurance benefits (DIB) and supplemental security income (SSI) benefits on January 15, 2004, alleging that she became unable to work on July 1, 2002.  The applications were denied initially and on reconsideration by the Social Security Administration.  On April 8, 2005, the plaintiff requested a hearing.  The administrative law judge, before whom the plaintiff, her attorney

and a vocational expert appeared on May 15, 2007, considered the case *de novo*, and on August 11, 2007, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The administrative law judge's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on March 14, 2008. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the administrative law judge:

(1)    The claimant met the insured status requirements fo the Social Security Act through June 30, 2005.

(2)    The claimant has not engaged in substantial gainful activity since July 1, 2002, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.961 *et seq*.).

(3)    The claimant has the following severe impairment: bilateral clubfoot deformities, status post multiple surgeries (20 CFR 404.1520(c) and 416.920(c)). I specifically find that there is no severe mental impairment.

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to stand and walk a maximum total of two hours in a workday, to sit a maximum total of six hours in a workday and to lift and carry a maximum of 10 pounds occasionally. She can use the feet to operate foot controls only occasionally. She can occasionally climb/ramps stairs and can never climb ladders/ropes/scaffolds. She can crouch only occasionally. She has no manipulative, visual, communicative or environmental limitations. She has the exertional capacity for a full range of sedentary work.

(8) [sic] The claimant is capable of performing past relevant work as a receptionist. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

(9)    [sic] The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2002 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. §423(a). "Disability" is defined in 42 U.S.C. §423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing substantial gainful employment. 20 C.F.R. §404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. §404.1503(a). *Hall v. Harris*, 658 F.2d 260 (4th Cir. 1981).

3

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. §423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Richardson v. Perales*, 402 U.S. 389 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as :

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

4

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that her conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 46 years old on the date of the ALJ's decision (Tr. 65). She has an eleventh-grade education and has worked as a receptionist, cashier, and textile worker (Tr. 73, 82-89, 319-29).

### *Medical Evidence*

The record reveals that the plaintiff was examined by Dr. Jack R. Whittaker in April 2002 at the request of the South Carolina Vocational Rehabilitation Department. The plaintiff reported that her current job as a retail sales clerk required her to be on her feet all day. She related a history of surgeries for clubfoot deformities during childhood and severe pain in her feet due to standing. Dr. Whittaker diagnosed clubfeet with heel/cord tightness and recommended orthopedic evaluation (Tr. 122-23).

Dr. William K. Manning, an orthopedist, examined the plaintiff in May 2002. The plaintiff complained of pain with walking or standing of any length of time and denied any current medications. Dr. Manning found the plaintiff had excellent gait with her shoes on, "some vague puffiness" around the ankles, tenderness in the mid-foot, and no neurovascular abnormalities. X-rays showed a large exostosis off the dorsum of the talus, a somewhat misshapen navicular, and no significant degenerative changes. Dr. Manning recommended surgery for bilateral tendoachilles lengthening, which he performed on the plaintiff on August 13, 2002 (Tr. 131-33).

5

In September 2002, the plaintiff complained of pain in her left ankle after stepping in a hole. Dr. Manning's examination revealed a completely intact Achilles tendon and tenderness over the anterior talofibular ligament without ligamentous laxity or significant swelling. He diagnosed a strained anterior talofibular ligament and prescribe Lorcet for pain. The plaintiff reported some improvement in her ankle pain in October 2002, but complained of weakness in her legs. Dr. Manning prescribed physical therapy for strengthening of the lower extremities (Tr. 127-30).

Dr. Manning found the plaintiff was walking "reasonably well" in November 2002, but she complained of significant discomfort due to a "snapping" peroneal tendon on the left. Dr. Manning recommended surgical repair, followed by a cast for six to eight weeks (Tr. 127). Dr. Manning performed a repair of left subluxing peroneal tendon on January 21, 2003 (Tr. 126). Approximately two months later, the plaintiff walked without a limp, reported no snapping of the peroneal tendon, and was doing "reasonably well" (Tr. 124).

Larry R. Korn, D.O., examined the plaintiff at the Commissioner's request on June 7, 2004. The plaintiff complained of leg pain with walking, and swelling in the legs with more than three hours of weight bearing. She reported gastroesophageal reflux disease (GERD), anxiety, and clubfoot deformities as her current problems, and Zantac as her only current medication. She stated that she worked as a drapery threader in the textile industry for ten years until the plant closed. She stated that she most recently worked as a retail cashier for General Nutrition Centers in 2001, and that she was fired when a management official observed her sitting at work. The plaintiff also stated that she had worked in the past as a musician and singer, and that she was currently busy writing and playing music. Dr. Korn's examination revealed altered gait, full strength and range of motion in the upper extremities, and obvious clubfoot deformity with residual equinus of the feet. Dr. Korn concluded that the plaintiff would have substantial difficulty navigating uneven surfaces and should work only at floor level. He stated that she could tolerate weight bearing for two to

6

eight hours per day and would do better in work circumstances that did not require extensive walking and would allow her to get off her feet periodically throughout the day (Tr. 182-84).

Dr. William B. Hopkins, a State agency physician, assessed the plaintiff's physical residual functional capacity on June 17, 2004. Dr. Hopkins concluded that the plaintiff could lift 50 pounds occasionally and 25 pounds frequently; could stand and/or walk for six hours and sit for six hours in an eight-hour day; had limited ability to use foot controls; could never climb ladders and scaffolds, occasionally climb stairs, and occasionally balance, and crouch; and could frequent stoop, kneel, and crawl (Tr. 185-92).

A second State agency physician, Dr. Hugh A. Clarke, assessed the plaintiff's physical residual functional capacity on December 14, 2004. Dr. Clarke concluded that the plaintiff could lift 50 pounds occasionally and 25 pounds frequently; stand and/or walk for six hours and sit for six hours in an eight-hour day; had unlimited ability to use foot controls; could never climb ladders and scaffolds, occasionally climb stairs, and frequently balance, stoop, kneel, crouch, and crawl (Tr. 207-14).

From February 2005 to January 2006, the plaintiff received prescriptions for Ativan (indicated for anxiety), Atenolol (indicated for hypertension), Zantac (indicated for GERD), and HCTZ (indicated for edema and hypertension) at Saint Luke's Free Medical Clinic (Tr. 238-47).

From November 2006 through February 2007, Dr. Edwin A. Padgett prescribed HCTZ (for hypertension), Atenolol (for hypertension), Lorazepam (for depression), and Lortab (for knee pain) for the plaintiff (Tr. 296-300).

### Psychological Treatment and Evaluations

Richard S. Carson, a psychologist with the South Carolina Vocational Rehabilitation Department, examined the plaintiff in April 2002. The plaintiff related a

7

history of panic attacks and posttraumatic stress-type symptoms related to abuse by her husband. She reported that her husband had been in prison for 2½ years for assaulting her several times, and that he was soon to be released. She requested an orthopedic evaluation with regard to her foot problems. She expressed an interest in "office-type" jobs that required little or no standing and in attending a technical school to become proficient with computers . Dr. Carson diagnosed post-traumatic stress disorder and panic disorder with mild agoraphobia. He recommended psychiatric and orthopedic evaluations, group counseling for spousal-abuse survivors, and personal and vocational counseling (Tr. 121).

Dr. R.D. Cox, III, a psychiatrist, evaluated the plaintiff in August 2002. With the exception of her foot deformities and corrective surgeries, the plaintiff reported no significant medical problems and no current psychiatric medications. She reported taking Paxil and Valium in the past with positive effects. Dr. Cox diagnosed probable post-traumatic stress disorder, panic disorder with mild agoraphobia, and a current GAF of 65-70.[1] He prescribed Paxil and Valium (Tr. 145-46).

Dr. Cox treated the plaintiff for panic disorder with agoraphobia in monthly, 20-minute sessions from September 2002 to June 2003. Throughout that period, Dr. Cox noted no signs of psychosis or reports of suicidal ideation (Tr. 135-44). In February 2003, the plaintiff reported increased panic attacks, and Dr. Cox added Remeron to her regimen (Tr. 140). In April, May, and June 2003, Dr. Cox noted that the plaintiff's mood and affect were appropriate (Tr. 135-38). In June 2003, he noted that the plaintiff was "doing quite well" on Xanax and Paxil, and that she was not taking Remeron on a daily basis (Tr. 135).

---

[1] A Global Assessment of Functioning (GAF) code between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

The plaintiff also sought treatment for chest pain in June 2003 after losing her Paxil and Xanax (Tr. 155-59).

Lisa Varner, Ph.D., a State agency psychologist, reviewed the plaintiff's records in June 2004 and concluded that she did not have a "severe"[2] mental impairment (Tr. 193-206).  Another State agency psychologist, Xanthia P. Harkness, Ph.D., reached the same conclusion in February 2005 (Tr. 224-37).

James N. Ruffing, Psy.D., evaluated the plaintiff at the Commissioner's request on January 31, 2005.  The plaintiff told Dr. Ruffing that she had worked as a photographer for two years, had worked in a textile plant for nine years, and had worked as a singer, musician, and entertainer for 10 years.  She stated that she last worked as a retail salesperson for General Nutrition Centers in 2001, and was fired when a manager saw her sitting.  She reported problems with depression "off and on," but reported no current psychotropic medications.  Dr. Ruffing found the plaintiff had intact thought processes, normal cognitive processing speed, intact memory, good concentration, and "strong mastery of cognitive faculties."  He found she failed to demonstrate significant indices of depression and diagnosed adjustment disorder with depressed mood.  Dr. Ruffing also found the plaintiff could perform "repetitive, if not varied tasks, and [could] likely understand, remember, and carry out detailed to complex instructions" (Tr. 216-19).

C. David Tollison, Ph.D., evaluated the plaintiff on October 31, 2006, at the request of her attorney (Tr. 254-58, 273).  The plaintiff told Dr. Tollison that she had worked as a guitar player/singer, security guard, receptionist, and retail salesperson.  She stated that she worked longest (i.e., for 10 years) as a machine operator in a textile mill, and that she last worked in 2001 as a restaurant cook.  Based on a review of the plaintiff's medical records, his interview of the plaintiff, and the results of psychological testing, Dr. Tollison

---

[2]An impairment is "severe" if it significantly limits a claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1521(a).

diagnosed dysthymic disorder, anxiety-related disorder, and a GAF code of 50.[3]   He

concluded that the plaintiff would deteriorate markedly when exposed to work pressure,

would be unable to maintain concentration and attention over time due to her physical and

psychological symptoms, would require an unreasonable number of rest breaks at work due

to increased pain with weight bearing, would experience increased anxiety if required to

work with the public or interact regularly with other individuals, and would have difficulty

maintaining regular attendance and working within a schedule (Tr. 254-58).   On May 1,

2007, in a sworn statement and a Psychiatric Review Technique form, Dr. Tollison indicated

that the plaintiff had marked limitations in activities of daily living, social functioning, and

concentration/persistence/pace, and that she therefore met or equaled Listings 12.04

(affective disorders) and 12.06 (anxiety-related disorders)[4] (Tr. 271-95).


***Testimony***

At the hearing on May 15, 2007, the plaintiff testified that she worked for five

days in a convenience store in 2005, but was unable to continue due to pain (Tr. 318).   She

testified that she worked part-time as a cashier for General Nutrition Centers for five months

in 2002, until the business closed (Tr. 319).   She testified that during 1995-2000, she

worked for a temporary service, a cleaning business, a restaurant, a grocery store, three

casinos, a liquor store, a gas station, a tanning salon, a clothing store, an oil company, and

as a full-time receptionist for Olan Mills, a photography business, for eight or nine months

(Tr. 319-29).   She testified that she left her job at Olan Mills because she was being

---

[3]A Global Assessment of Functioning (GAF) code between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

[4]*See* 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04, 12.06.

sexually harassed (Tr. 331). She testified that she would currently be unable to work as a receptionist because of problems with her nerves (Tr. 330-31). She indicated that she experienced severe, constant pain in her feet, ankles, and lower legs, and that she relied on Ibuprofen and Tylenol for pain relief (Tr. 334-35). She testified that she cooked, washed dishes, and did laundry for herself and her fiancé (Tr. 342-43). She testified that she had no treating physician and took no medication between June 2003 and 2005 (Tr. 347-49). She testified that her husband was currently incarcerated for abuse and attempted robbery of another woman, that he was incarcerated during 2000–2002 for armed robbery, and that he had been incarcerated twice for a few days for abusing her (Tr. 339, 355-57).

Kathleen H. Robbins, Ph.D., a vocational expert, testified that the plaintiff's past work as a receptionist was sedentary, semi-skilled work (Tr. 359). She testified that if the plaintiff had the residual functional capacity reported by Dr. Hopkins, she could perform her past work as a receptionist (Tr. 359-60). Dr. Robbins also testified that if the plaintiff had the limitations reported by Dr. Korn in his June 7, 2004 report, she could perform her past work as a receptionist (Tr. 360).

## ANALYSIS

The plaintiff alleges disability since July 1, 2002, due to leg surgeries, arthritis, panic attacks, heart murmur, and rapid heartbeat. She was 46 years old on the date of the ALJ's decision. The plaintiff has an 11th grade education and past relevant work as a receptionist, cashier, and textile worker. The ALJ found that the plaintiff retained the residual functional capacity ("RFC") to stand and walk a maximum total of two hours in a workday, to sit a maximum total of six hours in a workday, and to lift and carry a maximum of 10 pounds occasionally. The ALJ further found that she can use her feet to operate foot controls only occasionally, she can occasionally climb/ramps stairs and can never climb ladders/ropes/scaffolds, she can crouch only occasionally, and she has no manipulative,

11

visual, communicative or environmental limitations. The ALJ found the plaintiff has the exertional capacity for a full range of sedentary work and that she could perform her past relevant work as a receptionist. The plaintiff argues that the ALJ erred by (1) failing to give proper weight to the opinion of Dr. Tollison; (2) failing to include all of her impairments in the hypothetical question to the vocational expert; and (3) failing to comply with SSR 02-01p in not considering the impact of her obesity on her ability to work.

### Examining Physician

The plaintiff first argues that the ALJ failed to give proper weight to the opinion of Dr. Tollison, who evaluated her on October 31, 2006, at the request of her attorney (Tr. 254-58, 273). Based on a review of the plaintiff's medical records, his interview of the plaintiff, and the results of psychological testing, Dr. Tollison diagnosed dysthymic disorder, anxiety-related disorder, and a GAF code of 50.[5] He concluded that the plaintiff would deteriorate markedly when exposed to work pressure, would be unable to maintain concentration and attention over time due to her physical and psychological symptoms, would require an unreasonable number of rest breaks at work due to increased pain with weight bearing, would experience increased anxiety if required to work with the public or interact regularly with other individuals, and would have difficulty maintaining regular attendance and working within a schedule (Tr. 254-58). On May 1, 2007, in a sworn statement and a Psychiatric Review Technique form, Dr. Tollison indicated that the plaintiff had marked limitations in activities of daily living, social functioning, and concentration/

_____

[5]A Global Assessment of Functioning (GAF) code between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. 1994).

persistence/pace, and that she therefore met or equaled Listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders)[6] (Tr. 271-95).

As noted by the defendant, Dr. Tollison was only one of several psychologists who evaluated the plaintiff and, except for Dr. Tollison, none reported more than mild limitations.  In deciding what weight to give to a medical opinion, the ALJ considers the opinion in the context of the entire record.  *See* 20 C.F.R. § 404.1527(b) ("we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive"); *id.* § 404.1527(d)(1) ("Generally, we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you."); *id.* § 404.1527(d)(4) ("the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion").

As found by the ALJ, other evidence in the record relevant to the plaintiff's psychological condition outweighed Dr. Tollison's opinion.  Dr. Carson diagnosed post-traumatic stress disorder and panic disorder with mild agoraphobia, based in part on what the ALJ reasonably found were misrepresentations the plaintiff made about her circumstances[7] (Tr. 27, 121).  Although Dr. Carson did not assess the severity of the plaintiff's impairments, he did not indicate that the plaintiff's aspirations of attending technical school and obtaining a full-time "office-type" job were inappropriate (Tr. 121).  Dr. Cox, an evaluating psychiatrist, diagnosed the plaintiff with a GAF of 65, signifying "some

---

[6]*See* 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 12.04, 12.06.

[7]When the plaintiff applied for DIB and SSI, she reported that she stopped working at her last job (General Nutrition Centers) because she was robbed, and "it frightened [her] so much that [she] could no longer work" (Tr. 69). She told Dr. Korn, however, that she was fired from her job at General Nutrition Centers because a manager "saw her sitting and would not listen to any explanation" (Tr. 182). And in testifying, she indicated that she worked there until the business closed (Tr. 319). Similarly, the plaintiff told Dr. Carson in April 2002 that she had been severely abused by her third husband, who was still in prison for assaulting her repeatedly, and that her anxiety had worsened because he was soon to be released (Tr. 121). She testified, however, that her husband was incarcerated during 2000–2002 for armed robbery, and that he had been incarcerated only for a few days for abusing her (Tr. 355-57). The ALJ found that these and other "conflicting statements detract[ed] considerably from [the plaintiff's] credibility" (Tr. 31).

mild symptoms" (Tr. 145).  As the ALJ pointed out, Dr. Cox's observation that the plaintiff appeared "a bit anxious" was "the worst observation a treating doctor ever noted" about her psychiatric condition (Tr. 27, 141).  Dr. Ruffing, an examining psychologist, found the plaintiff failed to demonstrate significant indices of depression, had good capacity to concentrate, could perform "repetitive, if not varied tasks, and [could] likely understand, remember, and carry out detailed to complex instructions" (Tr. 145).  Drs. Varner and Harkness, State agency psychological consultants, found that the plaintiff had, at most, mild limitations in activities of daily living, social functioning, and concentration/ persistence/pace (Tr. 203, 234).  Thus, the opinions of Drs. Cox, Ruffing, Varner, and Harkness, supported the ALJ's determination that the plaintiff had no more than mild limitations in activities of daily living, social functioning, and concentration/persistence/pace.

Based upon the foregoing, this court finds that the ALJ did not err in giving little weight to Dr. Tollison's report.  Further, the evidence was sufficient under the substantial evidence standard of review to support the ALJ's determination that the plaintiff did not have a severe mental impairment.

### Hypothetical Question

The plaintiff next argues that the ALJ did not include all of her limitations in the hypothetical question to the vocational expert.  "[I]n order for a vocational expert's opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments."  *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989) (citation omitted).

The ALJ asked the vocational expert whether the plaintiff could perform her past work if she had the limitations found by Dr. Korn – i.e., that she could not walk on uneven surfaces, could not climb "ladders and such," and would do better if she could get

14

off her feet periodically throughout the workday (Tr. 360). The vocational expert testified that the plaintiff could perform her past work as a receptionist with those limitations (Tr. 360). The ALJ's RFC finding, on the other hand, limited the plaintiff to two hours of walking and standing per day, six hours of sitting per day, and occasional operation of foot controls, climbing of ramps and stairs, and crouching (Tr. 29). The ALJ did not include those limitations in her hypothetical (Tr. 360).

The defendant argues that the error is immaterial because the ALJ did not rely exclusively on the vocational expert's testimony. Rather, the ALJ compared the plaintiff's RFC with the demands of her past work as a receptionist and found that she could perform that job "as actually and generally performed" (Tr. 32). The plaintiff argues that while it is true the ALJ was not required to rely on vocational testimony to determine whether or not she could perform her past work, where the ALJ did elicit such testimony and failed to include all the limitations she found present, it suggests the ALJ did not consider all the limitations in comparing the plaintiff's past work to her RFC.

As argued by the defendant, the evidence supports the ALJ's finding. The plaintiff described her receptionist job as "primarily a sit-down job [greeting] clients," which involved scheduling appointments and answering phones, one hour of walking, one hour of standing, seven hours of sitting, and no climbing or crouching (Tr. 85). She did not indicate that the job required any lifting (Tr. 85). Thus, with the exception of the occasional use of foot controls, the plaintiff's description of the job's demands did not exceed her RFC. Further, sedentary jobs do not involve the use of foot controls. As the Sixth Circuit Court of Appeals has explained, "the definition of sedentary work does not require operation of foot controls. 20 C.F.R. § 404.1567(a): *compare with* 20 C.F.R. § 404.1567(b) (definition of "light work" lists operation of foot controls as an element)." *Hayes v. Sec'y of Health & Human Servs.*, No. 91-3142. 1991 WL 193455, *3 (6th Cir. 1991) (unpublished) (noting that "the definition of sedentary work does not require operation of foot controls"). Operation of

15

foot controls is required in certain light jobs, such as mattress sewing machine operator, motor-grader operator, and road-roller operator, but not in sedentary jobs like that of receptionist. *See* SSR 83-10, 1983 WL 31251, **5-6.  The job of receptionist, as it is generally performed in the national economy, was also within the plaintiff's residual functional capacity.  The Dictionary of Occupational Titles describes the job as requiring the ability to lift 10 pounds occasionally and negligible weight occasionally, walking and standing for brief periods of time, and no stooping, climbing, crawling, crouching, or kneeling.  For these reasons, the ALJ properly found that the plaintiff could perform her past job as a receptionist, given her RFC.

### *Obesity*

Next, the plaintiff contends that the ALJ failed to properly consider her obesity in accordance with SSR 02-1p.  SSR 02-01p recognizes that obesity can cause limitations of function in sitting, standing, walking, lifting, carrying, pushing, pulling, climbing, balancing, stooping, crouching, manipulating, as well as the ability to tolerate extreme heat, humidity, or hazards.  SSR 02-01p, 2000 WL 628049, *6.  The Ruling further states that "individuals with obesity may have problems with the ability to sustain a function over time" and that "[i]n cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity."  *Id.*  The Ruling also states:

> The combined effects if obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone.

*Id.*  Further, "[a]s with any other impairment, we will explain how we reached our conclusions on whether obesity caused any physical or mental limitations."  *Id.* at *7.

Here, however, no physician diagnosed the plaintiff with obesity. Dr. Korn, to the contrary, described her as "moderately overweight" in June 2004. At that time, the plaintiff was 5' 2½" and 158 pounds (Tr. 183). Moreover, the plaintiff did not list obesity among the causes of her disability (Tr. 68), and she failed to explain how her weight reduced her ability to perform the range of sedentary work that the ALJ found she could perform. Given the absence of a medical diagnosis of obesity and the lack of any allegation by the plaintiff of functional limitations secondary to obesity, the ALJ did not err by failing to consider the effects of obesity in assessing her RFC. *See Forte v. Barnhart*, 377 F.3d 892, 896 (8th Cir. 2004) (finding ALJ did not err in failing to discuss obesity where none of claimant's physicians suggested obesity imposed any additional work-related limitations); *Burch v. Barnhart*, 400 F.3d 676, 682-83 (9th Cir. 2005) (finding ALJ did not commit reversible error in failing to considering obesity at steps two, three, and four of the sequential evaluation where claimant failed to identify evidence of functional limitations due to obesity).

## **CONCLUSION**

This court has considered the entire record and finds that the ALJ's decision that the plaintiff is not disabled is based upon substantial evidence. Based upon the foregoing, the decision of the Commissioner is affirmed. The Clerk is directed to enter judgment for the defendant.

IT IS SO ORDERED.

s/William M. Catoe
United States Magistrate Judge

April 30, 2009

Greenville, South Carolina